IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 1, 2022

**IN RE ESTRELLA A. ET AL.**

**Appeal from the Juvenile Court for Montgomery County
No. 2019-JV-939, 2019-JV-940, 2019-JV-941 Tim Barnes, Judge**

_____

**No. M2022-00163-COA-R3-PT**

_____

Mother appeals the termination of her parental rights on five grounds, including severe child abuse. Because we conclude that clear and convincing evidence supports the grounds for termination and that termination is in the children's best interests, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

J. STEVEN STAFFORD, P. J., W.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and THOMAS R. FRIERSON, II, J., joined.

Taylor R. Dahl, Clarksville, Tennessee, for the appellant, Dixie A.

Herbert H. Slatery, III, Attorney General and Reporter; Carrie Perras, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

**I. FACTUAL AND PROCEDURAL BACKGROUND**

On January 8, 2018, the Tennessee Department of Children's Services ("DCS") received a referral that a child, Estrella A.[1], who was five years old at the time, had made disclosures to her teacher indicating sexual abuse. DCS informed the child's mother, Respondent/Appellant Dixie A. ("Mother"), about the abuse. Apparently, Estrella had already informed Mother about the discomfort she was experiencing and Mother had dismissed the discomfort as a result of the child's hygiene.

_____

[1] In cases involving termination of parental rights, it is this Court's policy to remove the full names of children and other parties to protect their identities.

DCS thereafter conducted a forensic interview with Estrella on January 9, 2018, in which she made detailed disclosures of sexual abuse by her maternal grandfather, Jerry A., who was living in the same home with Mother and her children.[2] Estrella and her two siblings were initially placed with a relative. On September 11, 2018, however, DCS filed a petition to declare the children dependent and neglected and asked that the children be placed in DCS's physical custody. Based on the petition, the Montgomery County Juvenile Court ("the trial court") issued a protective custody order removing the children and placing them in DCS custody. The children were placed with a foster family, where they remained at the time of trial.

Eventually, on June 11, 2019, DCS filed a petition in the trial court to terminate Mother's parental rights to three of her children, Estrella, Ryleigh D., and Dakota A. The petition alleged the following grounds: (1) abandonment by failure to support; (2) abandonment by failure to establish a suitable home; (3) substantial noncompliance with permanency plans; (4) persistent conditions; (5) severe child abuse; and (6) failure to manifest an ability and willingness to assume custody.[3] DCS later filed an amended petition on August 23, 2019.

Trial on the termination petition occurred on October 21, 2021.[4] DCS case manager Karissa Chapman ("Ms. Chapman" or "FSW Chapman") testified that she was Mother's caseworker not only at the inception of this case, but during a prior case as well. Specifically, in October 2017, DCS received a referral that one or more of Mother's children was drug-exposed.[5] Mother was at that time taking part in drug and alcohol treatment. The children were not removed at that time. But during one meeting around December 2017, Mother informed Ms. Chapman that she had been sexually abused by her father. Mother's sister, who was also present at the meeting, confirmed that she had also been sexually assaulted by Jerry A. Both women further confirmed that he had attempted to assault another girl during a slumber party when the women were teenagers. Based on these disclosures, Ms. Chapman cautioned Mother not to allow Jerry A. around her children. Mother agreed.

In her testimony, Mother admitted that a DCS case had been opened regarding her own abuse as a minor and that there may have been an incident with her father as a teenager, but she denied having any memory of abuse perpetrated against her when she was a child

---

[2] Mother's sister and her children also lived in the home.
[3] DCS also sought to terminate the parental rights of the children's fathers. Their rights were terminated, and they are not a party to this appeal.
[4] During the trial, counsel stated that the hearing also involved DCS's dependency and neglect petition, which had never been finally adjudicated. The dependency and neglect action and the termination action were filed under separate docket numbers, albeit in the same court. Neither party asserts that this procedure was in error in this appeal.
[5] As detailed, infra, this was not DCS's first involvement with Mother and her children.

because she was "too young." Still, Mother appeared to admit that the above-detailed conversation with Ms. Chapman occurred; Mother claimed, however, that she did not allow Jerry A. to be around her children following that conversation.[6]

According to DCS, Mother did not heed Ms. Chapman's warning. Following the 2017 Christmas holidays, Estrella disclosed to Mother her vaginal discomfort. Eventually, Estrella told Mother about the abuse. Mother admitted that when Estrella told her about what happened, her only response was "that if anything happened at nighttime to let me know, to kick on the wall."[7] As previously discussed, nothing was done until on or about January 8, 2018, when the child disclosed the abuse to a teacher and the abuse was reported to DCS, who began an investigation. The proof showed that Jerry A. pleaded *nolo contendere* to two counts of aggravated sexual battery of a child and was sentenced to two eight-year sentences.[8] Video of the child's forensic interview was submitted as proof that she was a victim of severe child abuse.

Although at trial Mother appeared to concede that the abuse had occurred, she denied that it occurred when she was in another room, as the child claimed in her forensic interview. Mother's testimony on this issue was as follows:

> Q.    . . . So as far as -- you've listened to this forensic [interview] today. As you sit here today, do you believe that your daughter was sexually assaulted by your father?
> A.     Like I said, I don't know what happened. It -- when the time she said that happened, when I was in the living room and she was in the sunroom, I honestly don't think there was any way it could happen at that time. I'm not saying it didn't happen. I'm saying it did not happen at that time.
>
> * * *
>
> Q.     As we sit here today, do you believe that that happened?
> A.     At the time, no. Like when she said it happened, no. I'm not saying it didn't happen, but the time she said it happened, no.
>
> * * *

---

[6] Specifically, the testimony was as follows:

> Q.     Was there a conversation that happened between you and Ms. Chapman in 2017 where she specifically told you not to have your children around your father?
> A.     Yes, and I didn't have my children around my father then. . . .

[7] According the forensic interview, Mother's sister also told Estrella to bite Jerry A.

[8] The testimony at trial was that Jerry A.'s effective sentence was sixteen years. The convictions submitted as evidence, however, indicate that the sentences were concurrent.

THE COURT: Ma'am, she's asking a very simple question. Do you believe your father molested your daughter?
THE WITNESS: Not with me in the other room, no. I didn't say --
THE COURT: I -- I'm not asking about the rooms. Do you think he ever molested your daughter?
THE WITNESS: I mean, by her testifying, it sounds like it, yes. But what I'm saying is, when I was in the other room, I don't think that happened then. I'm not saying it didn't happen at all. I'm saying when I was in the other room.
THE COURT: All right. Let's move on.

Mother admitted that when the child informed her, she failed to report the abuse to DCS or the police, or take the child to see a doctor.[9]

When questioned why Mother would allow Jerry A. around her children after Ms. Chapman's warning, Mother also claimed that she had not left the children alone with Jerry A. Still, Mother disputed that she had any right to remove Jerry A. from the home because she was living in the home of her sister. She also insisted that once the children were removed from her custody that she did remove him from the home and would never allow him to return to any home where her children were.[10] Except Mother admitted that she allowed her other children to be alone with Jerry A. on one occasion when it was unavoidable and only for a short period of time.

DCS family service worker/case manager Madison Huggins ("Ms. Huggins") further testified that Estrella "and other children" had previously been "sexually abused" by a "gentleman that [Mother] had allowed into the home."[11] Very little testimony was elicited about this incident except that the children have been "consistently in and out of State's custody or had involvement with [DCS] in some way[.]" Mother was also arrested following the removal of the children for charges related to possession of drug paraphernalia. Mother testified, however, that the charges were dropped because she was not in possession of the illegal items, but only in the car with drug users.

Mother's permanency plans focused on drug use, sexual abuse prevention, and housing. Pursuant to the plan, Mother was to, inter alia, complete an alcohol and drug assessment, follow any resulting recommendations, participate in random drugs screens, have stable housing and employment, visit with the children, pay $60.00 in child support per month, and complete a non-offender sexual abuse training class. It appears that Mother

---

[9] According to Ms. Chapman, Mother initially assumed that the child's discomfort was from not wiping correctly.

[10] DCS disputed that Mother immediately removed Jerry A. from the home because they received a report that he continued to live in the home until January 2019, a year after Estrella's disclosures.

[11] This abuse apparently occurred in 2014. Estrella, the eldest of the children at issue, would have been about two years old at this time.

- 4 -

completed many of these requirements, including a drug and alcohol assessment, parenting and drug abuse classes,[12] as well as the intensive outpatient program and counseling recommended by the assessment.[13] Mother also consistently participated in supervised therapeutic visitation with the children. When Mother filed a motion for unsupervised visitation, however, the supervisor of the visits recommended against it on the basis that Mother had not progressed in her visits, did not always follow instructions during the visits, and had recently come to a visit sick, exposing the children to "the virus."[14]

By the time of trial, Mother still had not completed the non-offender training classes, despite DCS setting her up with three different providers to take the class. Mother claimed that her failure to complete the program was not her fault.[15] As of the date of trial, Mother had "just got in [the classes]" and had attended a class the day before trial. According to Ms. Huggins, Mother also continued to deny that Estrella was a victim of Jerry A.'s abuse.

Mother also sometimes failed or missed random drug screens, though she claimed that her work schedule caused her absences. As a result, Mother was asked to complete a second alcohol and drug assessment, which she never completed. Still, it appears that after Mother completed intensive outpatient treatment, Mother consistently passed the drug screens for which she appeared. But Mother then failed a drug test administered the day before trial. That drug screen indicated that Mother was positive for THC. Mother claimed that the positive result was due to the consumption of legal Delta 8 gummies and that she did not know when she took them that they would result in a positive drug screen.

The proof further indicated that Mother was employed sporadically during the custodial period, but paid no child support during the four months preceding the filing of the amended termination petition, approximately April to August 2019. When asked whether she worked during this period, Mother testified that she could not remember but that she may have been pregnant and sick during that time. Mother submitted pay stubs,

---

[12] To show completion of these classes, Mother submitted an undated certificate of completion of eight required sessions of an Empowering Parenting Course and an April 2018 certificate of completion of a Chemical Awareness, Recovery, and Education class.

[13] A December 2018 psychological report in the record states that Mother stopped going to therapy in November 2018 and only saw her new therapist twice. It is unclear when Mother resumed therapy, though she claimed at trial that she was currently attending counseling.

[14] The April 8, 2020 letter of Sharon Davis, who oversaw Mother's therapeutic visitation, was admitted as an exhibit.

[15] The testimony indicates that Mother filed a motion regarding her inability to complete this class. The record contains a document entitled a "Notice of Filing" in which Mother states that she is ready to take the classes but blames DCS for not setting up the classes or paying for them. Moreover, the testimony was undisputed that the one of the providers that DCS set up in December 2018 did not offer the specific class that Mother needed. As for the other two times that DCS set up classes, Mother only vaguely claimed that they conflicted with her work schedule. Nothing in the record indicates that the COVID-19 pandemic was the culprit for Mother's purported inability to complete the classes.

however, showing that she was employed from July 29, 2019 to August 11, 2019. Mother also claimed that her IRS stimulus money was intercepted to pay child support. Mother testified that child support is now being deducted from her paycheck. Mother further testified that her employment was now stable and that she could financially support all five of her children, but Ms. Huggins testified that DCS never received any proof of this employment.[16]

Mother continued to stay in her sister's home for a time following the removal of the children. Ms. Huggins testified that DCS was unable to do a home visit on this home following the removal of the children. Eventually, in March 2019, Mother signed a lease on a new home that she shared with a boyfriend. After Mother provided DCS with proof of the lease around July 2019, DCS did perform a home study on this home, but deemed it inappropriate due to the boyfriend's substance abuse issues and open investigation with DCS. With regard to her boyfriends over the years, Mother testified that although she got involved with inappropriate men, she could not know about their inappropriateness until after she started dating them. Mother claimed to have entered into a new lease one week before trial, but provided no proof of such and had not provided that lease to DCS so that a home study could be performed.[17]

Ms. Huggins testified that the children are doing well in their foster home, where they have been continuously placed since coming into DCS custody. The children are academically and developmentally on track and the older two children participate in individual therapy designed to address the sexual abuse issues.[18] The children refer to their foster mother as "Mom" and there is a loving bond between the children and their foster parents. The foster family wants to adopt the children.

At the conclusion of the proof, the trial court granted DCS's petition to terminate Mother's parental rights. A final, written order was entered on January 25, 2022, in which the trial court found that DCS had proven the following grounds: (1) abandonment by failure to support; (2) abandonment by failure to establish a suitable home; (3) persistent conditions; (4) severe child abuse; and (5) failure to manifest an ability and willingness to assume custody; the trial court did not find clear and convincing evidence that Mother substantially failed to comply with permanency plans. The trial court also found that termination was in the children's best interests. From this order, Mother now appeals.

## II. ISSUES PRESENTED

---

[16] Mother's two youngest children, who were born after the removal of the older children, remain in her custody.

[17] When asked that she submit the new lease as proof, Mother claimed that she could reproduce the lease on her phone.

[18] According to Ms. Huggins, the children had progressed to such a place that they "don't talk about [the sexual abuse] often at all anymore."

As we perceive it, this appeal involves two issues:

1. Whether the trial court erred in finding clear and convincing evidence of grounds to terminate Mother's parental rights?
2. Whether the trial court erred in finding clear and convincing evidence that termination was in the children's best interests?

## III. STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016) (collecting cases). Therefore, "parents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." *Id.* at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." *Id.* at 522 (citations and quotations omitted). "Clear and convincing evidence is evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (quotation marks and citation omitted).

In Tennessee, termination of parental rights is governed by statute, which identifies "situations in which [the] state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove by clear and convincing evidence (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *See In re Valentine*, 79 S.W.3d at 546. "Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases." *In re Addalyne S.*, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018). The clear and convincing evidence standard applicable here is "more exacting than the 'preponderance of the evidence' standard, although it does not demand the certainty required by the 'beyond a reasonable doubt' standard. To be clear and convincing, the evidence must eliminate any substantial doubt and produce in the fact-finder's mind a firm conviction as to the truth." *In re S.R.C.*, 156 S.W.3d 26, 29 (Tenn. Ct. App. 2004) (internal citation omitted).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *See* Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 523–24 (citations omitted). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo

with no presumption of correctness." ***In re Carrington H.***, 483 S.W.3d at 524 (citation omitted).

## IV. ANALYSIS

## A. Grounds for Termination

Mother argues that none of the grounds found by the trial court were supported by clear and convincing evidence. We will consider each ground in turn.

### 1. Severe Child Abuse

We begin with the central reason that the children were removed from Mother's care: severe child abuse. Specifically, a ground for termination exists when

> The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

Tenn. Code Ann. § 36-1-113(g)(4). Severe child abuse is defined as, inter alia: "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death[.]" Tenn. Code Ann. § 37-1-102(b)(27).

The trial court found that Mother committed severe child abuse by "knowingly exposing the child to, and knowingly failing to protect the child from" sexual abuse committed by Jerry A. The trial court recounted the child's statements during the forensic interview, as well as the testimony of Ms. Chapman that Mother informed her that Jerry A. had also sexually abused her and her sister and that Mother was warned to keep him away from the children. Specifically, the Court commented as follows:

> 45. The Court finds it hard to believe that these two sisters who went through that terrible thing would not have had some discussion about what went on with them. But today the mother testifies that she doesn't remember anything about it. The Court does not find this credible, and the Court does not find [Mother] credible.
> 46. FSW Chapman described in detail what her and [Mother] discussed during the investigation. FSW Chapman even testified that [Mother] admitted to her that Jerry A. had even tried to assault a friend of [Mother's sister's], and that child, fortunately, escaped by going out a window.
> 47. Testimony today was that Jerry A., in front of the children, sits around

and watches porn on his phone as the children are walking through the room. This mother had every indication that Jerry A. is a severe threat of harm to any child; should not ever be around any child; should certainly not ever be left alone with a child, and yet it happened. The mother knew after it happened, and testimony was that she told Estrella, that if it happens again, she should just kick the wall or bite him.

48. [Mother] has woefully failed in her responsibility to protect her child, and I don't see how you can watch this forensic interview and not know that.

49. As stated previously, FSW Chapman testified that at the beginning of this case, [Mother] did not believe that her child was sexually abused and even today, she doesn't seem sure that her child was sexually abused by her father.

On appeal, Mother does not dispute that Estrella was the victim of sexual abuse by Jerry. A. Indeed, her brief characterizes her testimony as "acknowledge[ing] that . . . the abuse happened[.]"[19] Nor does she argue that this sexual abuse does not constitute severe child abuse as defined by section 37-1-102. Instead, Mother disputes that she knowingly failed to protect her child from the abuse, relying on her testimony that she never left the child alone with Jerry A., that she would call the police and DCS if something happened again, and that she would never allow the children around Jerry A. again.

Respectfully, Mother's argument is not convincing. Here, the trial court credited the testimony of Ms. Chapman that Mother had informed her that Jerry A. had been sexually inappropriate with her in the past and that Ms. Chapman counseled Mother to never allow Jerry A. around the children. Nothing in Mother's brief leads this Court to question the trial court's determination on this issue. *Hutchings v. Jobe, Hastings & Assocs.*, No. M2010-01583-COA-R3-CV, 2011 WL 3566972, at \*2 (Tenn. Ct. App. Aug. 12, 2011) ("The trial court is in the best position to resolve factual issues that hinge on credibility and an appellate court will not re-evaluate a trial court's assessment of a witness's credibility absent clear and convincing evidence to the contrary." (citation omitted)). But as Mother has "acknowledged," Mother did allow the child to be alone with Jerry A. in some manner because Estrella was abused by him. So Mother was aware of Jerry A.'s propensity toward sexual abuse, was warned to prohibit contact between Jerry A. and her children, and yet still allowed her child to become his victim. Mother's conduct constitutes a knowing failure to protect a child from severe child abuse. Although only one of Mother's children appears to have been victimized, this ground for termination is therefore affirmed as to all three children in this case. *See* Tenn. Code Ann. § 36-1-113(g)(4) (creating a ground for termination when the parent has committed severe child abuse against "any child").

---

[19] The central proof concerning the abuse consisted of a videotaped forensic interview with the child. Mother has not in any manner questioned the veracity or credibility of the child's statements during this interview. We therefore do not find it necessary to reproduce any of the child's statements in this appeal. We also note that although Jerry A.'s criminal convictions for sexual abuse were presented as evidence, after noting that Jerry A. pleaded no contest to the charges, the trial court admitted the convictions only for purposes of establishing Jerry A.'s current whereabouts.

## 2. Abandonment by Failure to Support

DCS next argues that the trial court correctly terminated Mother's rights on the ground of abandonment for failure to support. *See* Tenn. Code Ann. § 36-1-113(g)(1) (providing that abandonment as defined by Tenn. Code Ann. § 36-1-102 is a ground for termination). Under this provision, a ground for termination exists when

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child

Tenn. Code Ann. § 36-1-102(1)(A)(i). According to the statute, failure to support means

> the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period[.]

Tenn. Code Ann. § 36-1-102(1)(D); *see also* Tenn. Code Ann. § 36-1-102(1)(B) ("'[T]oken support' means that the support, under the circumstances of the individual case, is insignificant given the parent's means[.]"). As noted above, the statute considers the parent's payment of support in the four months preceding the filing of the termination petition "or any amended petition." Tenn. Code Ann. § 36-1-102(1)(A)(i). Moreover, to the extent that lack of willfulness is properly raised as an issue, the burden is on the parent to show that the failure to support was not willful. *See* Tenn. Code Ann. § 36-1-102(1)(A)(l) ("For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]").

In this case, the trial court's final order considers the time period prior to the filing of the amended petition. As such, both DCS and Mother agree that the four-month period prior to the filing of the amended petition is the relevant time frame for purposes of this ground. This time period spans from April 23, 2019, to August 22, 2019, the day before

the amended petition was filed.[20]

In recent cases, however, this Court has held that we should consider the period of time prior to the filing of the original petition, unless the amended petition constitutes a "'separate and distinct' petition from the original[.]" ***In Re Elijah F.***, No. M2022-00191-COA-R3-PT, 2022 WL 16859543, at 8 (Tenn. Ct. App. Nov. 10, 2022) (quoting ***In re Braelyn S.***, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *5 (Tenn. Ct. App. July 22, 2020)); *see also **In re Chase L.***, No. M2017-02362-COA-R3-PT, 2018 WL 3203109, at *9 (Tenn. Ct. App. June 29, 2018). Although the amended petition did alter the allegations concerning abandonment, it is something of a stretch to suggest that these alterations rendered the amended petition separate and distinct from its predecessor for purposes of this ground.

Still, in none of the cases cited above is there any indication that the parties agreed to utilize the four-month period preceding the filing of an amended petition. In this case, however, both DCS and Mother have chosen to utilize the amended petition for purposes of determining this ground. For DCS, this choice means little, as it presented evidence that Mother did not pay support during either the four-month period prior to the filing of the original petition or the four-month period prior to the filing of the amended petition.[21] But Mother's efforts to defeat this ground—by showing a lack of willfulness—are focused wholly on the four-month period preceding the filing of the amended petition.[22] Indeed, Mother does not point to, nor does our review of the record reveal, any evidence tending to show a lack of willfulness that was presented as to the four-month period preceding the filing of the original petition. Thus, we conclude that, in fairness to Mother and to aid in the expeditious resolution of this appeal, we will consider the evidence she presented on lack of willfulness between April 23, 2019, to August 22, 2019. *Cf. **State v. Bristol***, No. M2019-00531-SC-R11-CD, 2022 WL 5295777, at *3–7 (Tenn. Oct. 7, 2022) (holding that intermediate appellate courts should generally not consider issues that were not raised and briefed by the parties; holding that when such issues must be addressed, the court should not review the issue until after the parties have notice and an opportunity to respond); *c.f.*

---

[20] Although the trial court was a day off in its findings of fact as to the relevant time frame, such an error is harmless if "the trial court made sufficient findings of fact that encompassed the correct determinative period." ***In re J'Khari F.***, No. M2018-00708-COA-R3-PT, 2019 WL 411538, at *9 (Tenn. Ct. App. Jan. 31, 2019); *see also **In re Porcalyn N.***, No. E2020-01501-COA-R3-PT, 2021 WL 2026700, at *5 (Tenn. Ct. App. May 21, 2021).

[21] The record indicates that Mother did allow support to be deducted from her pay just a few days following the filing of the amended termination petition, in paystub dated August 27, 2019. However, Tennessee Code Annotated section 36-1-102(1)(F) provides that "[a]bandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child[.]"

[22] DCS makes a perfunctory argument that willfulness may have been waived by Mother, but concedes that it may have been tried by consent. We conclude that this issue was tried by consent in the same manner as ***In re Serenity S.***, No. E2019-00277-COA-R3-PT, 2020 WL 522439, at *7 (Tenn. Ct. App. Jan. 31, 2020).

*In re Josiah T.*, No. E2019-00043-COA-R3-PT, 2019 WL 4862197, at *4 (Tenn. Ct. App. Oct. 2, 2019) (noting "the importance that the parental termination statutes place on expeditious resolution of these matters") (citing Tenn. Code Ann. § 36-1-124(c) ("It is the intent of the general assembly that the permanency of the placement of a child who is the subject of a termination of parental rights proceeding or an adoption proceeding not be delayed any longer than is absolutely necessary . . . .")).

Unfortunately for Mother, even utilizing her chosen time period, we conclude that she failed to prove that her lack of support during this time was not willful. To be sure, Mother testified that she may have been pregnant during this period and therefore sick and unable to work. But Mother also submitted pay stubs demonstrating that she was employed during at least parts of this four-month period. The two paychecks that Mother submitted that show pay received between April 23, 2019, to August 22, 2019, however, do not indicate that any support was being deducted from Mother's pay. No other evidence was presented to show that any support payments were made during this time frame. Given that no payments were made, it is no defense that Mother's sporadic employment may have rendered her capable of only paying smalls amounts of support or of only paying during a portion of her chosen four-month period. *See* Tenn. Code Ann. § 36-1-102(1)(D) ("That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period[.]"). And given that the evidence indicates that Mother was capable of employment during at least a portion of her chosen four-month period, we cannot conclude that the evidence preponderates against the trial court's finding that Mother failed to show a lack of willfulness in her non-payment of support during this time. Thus, regardless of the four-month period at issue, DCS presented clear and convincing evidence that Mother failed to support the children as required to prove this ground for termination. This ground is therefore affirmed.

### 3. Abandonment by Failure to Establish a Suitable Home

Abandonment may also be shown under the following circumstances:

(a) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
(b) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
(c) For a period of four (4) months following the physical removal, the

- 12 -

department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(l)(ii).

Mother argues that the trial court erred in finding sufficient evidence of this ground for termination, contending that DCS did not detail the reasonable efforts it took during the relevant time frame to help her secure housing, that DCS failed to complete a walk-through of her home immediately following the abuse to confirm that Jerry A. did not live there, and that she had provided DCS with various lease agreements. Respectfully, we disagree.

First, we agree with the trial court that DCS made reasonable efforts in this case. Here, the evidence showed that DCS provided a multitude of services to Mother not only in the four months following the removal of the children, but for the life of this case. *See **In re Jakob O.***, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016) ("As long as the proof relates to 'a period of four (4) months following the removal,' Tenn. Code Ann. § 36-1-102(1)(A)(ii), the ground may be established. The statute *does not* limit the court's inquiry to a period of four months *immediately* following the removal."). These efforts include creating permanency plans, explaining to Mother the Criteria for Termination of Parental Rights, providing random drug screenings to Mother, facilitating therapeutic visitation, and doing home visits, as well as setting up classes and assessments for Mother on multiple occasions. Although Mother certainly did complete some services, including assessments, intensive outpatient treatment, and some drug screenings, given that she also missed many drug screens, did not complete a second assessment following missed or failed drug screens, had not provided DCS with proof of a stable home or income, and had not yet completed non-offender sexual abuse classes by the time of trial, we cannot conclude that her efforts exceeded that of DCS.

We further conclude that Mother had yet to establish a suitable home for the children in the three years following the removal. During this time, Mother has had at least three residences. First, Mother lived in the home the children were removed from, which belonged to Mother's sister. Mother claimed that this home was safe because she had forced Jerry A. to move out following the removal of the children. But the proof shows that when DCS told Mother to not allow Jerry A. to live in the house prior to the abuse, Mother

- 13 -

did nothing, claiming that she had no right to ask him to move because it was not her house. Then, when Estrella told Mother about the abuse, Mother again did nothing, telling the child to kick the wall if it happened again. But after the child was removed by DCS, Mother claimed that she did have the power to remove Jerry A. from the house and that she had finally exercised that power. Mother did not, however, remain in this home for the entirety of the custodial episode.

Around July 2019, Mother next provided DCS with a lease for a home that she shared with a boyfriend. DCS conducted a home study of this home but found that the children could not live there because of the boyfriend's DCS case history and substance abuse. Indeed, Mother admitted that she had five boyfriends over the past five years, most of whom had drug issues; two of these boyfriends, Mother allowed to move in with her and her children. Mother admitted that she waits until after she is in a relationship to learn about her boyfriend's drug issues or criminal tendencies.[23] Finally, at trial, Mother testified that she had entered into another lease for a home that she had just moved into. But because DCS was never provided with this information prior to trial, it could perform no home study. As such, Mother's effort to obtain housing on the eve of trial was largely too little, too late. *In re L.J.*, No. E2014-02042-COA-R3-PT, 2015 WL 5121111, at \*7 (Tenn. Ct. App., filed Aug. 31, 2015) (holding that mother's ability to obtain housing two weeks before the final trial date was "too little, too late" and did not demonstrate mother's ability to provide a suitable home "at an early date").

But even if Mother's physical home was safe for the children, that is not all that is required to establish a suitable home. Instead, the home must be safe from drug use and the risk of abuse. *In re Jamarcus K.*, No. M2021-01171-COA-R3-PT, 2022 WL 3755383, at \*8 (Tenn. Ct. App. Aug. 30, 2022), *perm. appeal denied* (Tenn. Sept. 27, 2022) (quoting *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at \*9 (Tenn. Ct. App. June 10, 2014). Mother met neither of these requirements. For one, Mother admitted that she failed a drug test on the eve of trial. While Mother claimed that the positive result stemmed from the consumption of legal Delta 8 gummy candy, Mother provided no proof to establish that the positive result was due to legal consumption. Moreover, even if we believe Mother, her decision to consume such items in the weeks before the termination trial shows poor judgment on her part. First, it is unclear if Mother took these drugs while caring for her other children. Additionally, Mother's choice put her in the position of having to explain a positive drug test on the eve of a trial determining the permanent cessation of her relationship with three of her children. So even if the consumption of Delta 8 gummies was legal, it was certainly unwise under the circumstances.

---

[23] Specifically, the testimony was as follows:

> Q. Wouldn't it be fair to say that you do not take your children into consideration when you pick who you're going to live with?
> A. Well, I don't know they're that way until after I get in a relationship with them.

- 14 -

Additionally, Mother has failed to take the steps necessary to give this Court confidence that Mother will protect the children from future abuse. As detailed above, Mother ignored warnings about Jerry A., which ultimately resulted in her daughter being victimized. Mother has refused to recognize her culpability for the abuse and has refused to take the steps DCS requested to ensure that such abuse never happens again, namely completing the non-offender sexual abuse training and keeping inappropriate men away from her children. Although Mother lays the blame for her non-completion of the non-offender classes with DCS, the proof shows that DCS put Mother in touch with at least two appropriate providers for this training. And despite nearly three years to complete these classes, Mother claimed that her work schedule prevented her from taking the classes. But then Mother was miraculously able to find the time to take the classes immediately prior to trial.[24] These facts indicate that Mother did not make the classes a priority until it was too late. *See In re L.J.*, 2015 WL 5121111, at *7. And given the multiple instances of sexual abuse that have occurred and Mother's history of not taking warnings about sexual abuse seriously, without these classes, it does not appear that Mother has the knowledge and skills necessary to prevent sexual abuse from occurring in the future. Under these circumstances, we must conclude that Mother has not established a suitable home and has demonstrated such a lack of concern in doing so that it is unlikely that she will be able to provide a suitable home at an early date. This ground is therefore affirmed.

### 4. Persistence of Conditions

DCS next relies on the ground of persistence of conditions, pursuant to Tennessee Code Annotated section 36-1-113(g)(3):

> (A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> > (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
> > (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
> > (iii) The continuation of the parent or guardian and child relationship

---

[24] The testimony discusses a single class being taken the day before trial. It is unclear if Mother had attended more than this single class.

greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Here, there is no question that the children were removed from Mother's custody in the course of a dependency and neglect proceeding and had been removed for a period of longer than six months. Thus, the dispositive questions are whether conditions persist that prevent the safe return of the children, whether the conditions will likely be remedied at an early date, and whether the continued relationship prevents early integration of the children into a safe, stable, permanent home. As we have previously explained,

A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at *6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion [] that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)).

*In re Navada N.*, 498 S.W.3d 579, 605–06 (Tenn. Ct. App. 2016).

With regard to this ground, the trial court found that the following conditions still existed: (1) lack of stability; (2) lack of appropriate parenting skills; (3) lack of sufficient housing and income; (4) Mother's continued denial that Estrella was the victim of sexual abuse; and (5) Mother's continued mental health issues.

Although Mother now appears to concede that Estrella was the victim of sexual assault, we agree with the trial court's other conclusions. Importantly, while Mother may now admit that the child was abused, she continues to deny or minimize her role in the child's victimization. According to the facts found by the trial court and supported by the

record, Mother had previously been warned not to allow Jerry A. access to her children in order to prevent sexual abuse. Mother apparently ignored that warning. Given the repeated victimization of Mother's children, Mother's continued minimizations of that abuse, and her failure to complete the classes directly relevant to the sexual abuse, we unfortunately have little faith that Mother will now protect her children from abuse. This is an issue that prevents Mother from safely parenting her children.

Mother's lack of stability is also persistent. Mother's testimony shows that she often involves herself with criminals. Her housing is not stable, as illustrated by the fact that she moved frequently and sometimes would not allow DCS to perform home studies. Indeed, Mother moved to a new home just a week before trial, leaving DCS with no opportunity to perform a home study. Mother's children cannot be returned to her home without proven stable housing to come home to.

Given that approximately three years have elapsed from the time that the children were removed, we also conclude that these conditions are unlikely to be remedied at an early date. Moreover, the continued legal relationship between Mother and the children prevents them from being adopted, which is a possibility for these children. As such, the trial court did not err in finding clear and convincing evidence of persistence of conditions.

### 5. Willingness and Ability to Assume Custody or Financial Responsibility

DCS next contends that Mother failed to manifest a willingness and ability, whether by act or omission, to personally assume legal and physical custody or financial responsibility of the child and that placing the child in her legal and physical custody would create a risk of substantial harm to the child's physical or psychological welfare. Tenn. Code Ann. § 36-1-113(g)(14). Essentially, the statutory ground has two distinct elements which must be proven by clear and convincing evidence:

> First, DCS must prove that [the parent] failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." DCS must then prove that placing the child[] in [the parent's] "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child."

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (quoting Tenn. Code Ann. § 36-1-113(g)(14)) (some alterations of the original text removed). As for the first element, the petitioner must "prove[ ] by clear and convincing proof that a parent or guardian has failed to manifest either [an] ability or willingness" to parent the child. *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020).

The trial court found that this ground was met by Mother's failure to pay child support, failure to complete services required by DCS, and failure to demonstrate that she

could financially support the children. The trial court further found that placing the children in Mother's custody would pose a risk of substantial harm because Mother "failed to protect her child from severe sex abuse and she has proven by her testimony that there is great likelihood that she would fail to protect her children from further abuse."

On appeal, Mother argues that she is both willing and able to take physical custody and financial responsibility of the children, citing her substantial compliance with the permanency plans by completing assessments, an intensive outpatient program, and drug screens. She also argues that her failure to complete the non-offending sexual abuse parenting class was not her fault, that she removed Jerry A. from her home and promised he would not come back, and that she understood that if something happened again, she would need to call the police and DCS. In contrast, DCS argues that Mother's history of housing instability, relationships with drug users, failure to cooperate with DCS by completing all the requirements of her permanency plans or to complete the non-offender training demonstrate that she is neither willing nor able to take custody of the children. DCS also argues that Mother's failure to pay child support shows that she is unwilling and unable to take financial responsibility for the children.

We agree with DCS and the trial court. Here, Mother only began paying child support following the filing of the amended termination petition, despite working intermittently throughout the custodial period.[25] At trial, Mother appeared to place the blame for the lack of support on the fact that the support was not always deducted from her pay depending on where she was working. It was Mother's responsibility, however, to ensure that her children received support when she was receiving income, not her employer's responsibility. As such, Mother's failure to remit support for the children independent of payroll deductions supports a finding that she was unwilling to take the steps necessary to financially support her children in DCS custody.

Mother was also unwilling to take the steps necessary to assume custody of the children. Here, a significant barrier to reunification is the risk of abuse that could occur in Mother's care. As previously discussed, it appears that Mother only took her responsibility to take the non-offender sexual abuse class seriously on the eve of trial. This class is a necessity given Mother's role in exposing Estrella to sexual abuse and her inability to accept her role in that abuse. So Mother's failure to take the steps necessary to ensure that Estrella and the other children are not at risk of future sexual abuse indicates that she is unwilling to do the work necessary to have the children returned to her care.

We also agree that placing the children in Mother's legal and physical custody

---

[25] The first paystub submitted by Mother to indicate that child support was being deducted from Mother's pay is dated August 27, 2019, a few days following the filing of the amended petition. An August 2020 paystub from Mother's current employment, however, showed that Mother had paid less than $100.00 in total child support for the year-to-date.

would create a risk of substantial harm to their welfare. *See* Tenn. Code Ann. § 36-1-113(g)(14). With regard to substantial harm, this Court stated that:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, 2018 WL 1629930, at *7 (quoting **Ray v. Ray**, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted)). The trial court's concern that Mother would not protect the children from future abuse is well supported by the record. Here, Mother continues to deny or minimize her fault in her daughter's sexual abuse. She has not completed the non-offender sexual abuse class even after three years. And while she promises that she would not allow Jerry A. around her children, she made the same promise to Ms. Chapman before Estrella was abused. Under these circumstances, we agree that there is a likelihood that Mother would once again fail to protect her children from abuse if they were returned to her. This ground is therefore affirmed.

## B. Best Interest

Because we have determined that at least one statutory ground has been proven for terminating Mother's parental rights, we must now decide if DCS has proven, by clear and convincing evidence, that termination of Mother's rights is in the child's best interests. Tenn. Code Ann. § 36-1-113(c)(2); **White v. Moody**, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). If "the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child." *In re Navada N.*, 498 S.W.3d at 607.

According to the version of the statute at issue when this case was filed and decided, the trial court was directed to consider the following best interest factors:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established

between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (2020). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." ***In re M.A.R.***, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005) (citations omitted).

The trial court in this case did not specifically tie any of its best interest findings to the above factors. Mother argues, without citation to authority, that this shortcoming renders the trial court's order "deficient." We agree that the trial court in a termination of parental rights case must "enter an order that makes specific findings of fact and conclusions of law[.]" Tenn. Code Ann. § 36-1-113(k).[26] Here, the trial court's order indeed contains findings as to the children's best interests. Moreover, while the trial court does not tie its findings to the relevant factors, a review of the trial court's order reveals that it did consider the majority of the best interest factors. Although we agree that the best practice is for the trial court to consider each and every factor explicitly, we conclude that the trial court's order here is sufficient to meet the requirements of section 36-1-113(k) and to facilitate meaningful appellate review. So we will consider the children's best interests despite the trial court's somewhat deficient best interest findings.

---

[26] The current version of this statute provides in addition to the above quoted portion of the statute that "[a]ll factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order." Tenn. Code Ann. § 36-1-113(i)(3) (2022); *see also* 2021 Tenn. Laws Pub. Ch. 190 (S.B. 205), eff. April 22, 2021 (enacting this amendment). There is no assertion that this amended version of the statute is applicable in this case. The best interest factors were also amended to include additional factors for consideration. Again, we apply the statute that was in effect at the time the petitions at issue were filed.

As for the first two factors, the trial court found that Mother "failed to demonstrate continuity and stability in meeting the children's basic material, educational, housing and safety needs." The trial court further found that Mother "failed to demonstrate a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home[.]" We agree. Here, despite a multitude of services provided to Mother, she failed to show any stability in her housing situation or any recognition for her role in Estrella's abuse, and she continued to engage in poor decision-making that was a barrier to reunification even in the weeks before trial. Under these circumstances, we conclude that the trial court did not err in finding that Mother had not made a lasting adjustment of circumstances, despite reasonable efforts by DCS. *See* Tenn. Code Ann. § 36-1-113(i)(1) & (2).

The trial court did not make any findings as to whether Mother had maintained visitation with the children or whether there was a meaningful bond between Mother and the children. *See* Tenn. Code Ann. § 36-1-113(i)(3) & (4). The trial court did specifically find, however, that a change in caretakers would have a detrimental effect on the children. *See* Tenn. Code Ann. § 36-1-113(i)(5). The record shows that Mother did continue to engage in visitation with the children after removal. So this factor favors Mother. The evidence as to Mother's meaningful relationship with the children was less clear. No witness was specifically asked if the children had a meaningful relationship with Mother. Ms. Chapman did testify, however, that the children do not "see [Mother] as their Mother"; instead, they view their foster mother in that role and call their foster mother "Mom."[27] Moreover, the testimony indicates that visitation with Mother was not productive and could never progress beyond supervised therapeutic visitation. And because of this bond and the care that the children have been receiving in the foster home, there was little dispute that changing caretakers would be negative for the children. So factors (4) and (5) favor termination in this case.

Factor (6), concerning abuse, heavily favors termination in this case. *See* Tenn. Code Ann. § 36-1-113(i)(6). Here, the evidence shows that Mother allowed Estrella to become victimized by Jerry A., even after being warned against that exact eventuality. And this was not the first time that Mother allowed a man in her life who victimized the children. Hopefully, however, if Mother's rights are terminated, it will be the last time.

The trial court also found that the environment of Mother's home is not safe. *See* Tenn. Code Ann. § 36-1-113(i)(7). As previously discussed, we agree that Mother has not shown that her home is stable and free from drug use, and does not pose a risk of future criminal activity or child abuse. This factor therefore favors termination.

The trial court made no specific findings as to factor (8), concerning whether

---

[27] In contrast, the children sometimes call Mother "Momma Dixie."

Mother's mental and emotional status would be detrimental to the children. *See* Tenn. Code Ann. § 36-1-113(i)(8). The trial court did note, however, that while the children receive therapy in their foster home, Mother's denial of the sexual abuse indicates that she would not continue the counseling for the children. We tend to agree. In this case, Mother's testimony was inconsistent about the abuse that she suffered at the hands of Jerry A. Perhaps because Mother is unable to face the abuse that she herself suffered, she was unwilling to protect her child from similar abuse. To the extent that Mother was truthful that she is currently seeking counseling, we commend her for her decision to participate in that mental health treatment. Unfortunately, without more indication that Mother has made progress in her treatment and in her ability recognize the dangerous situations that she has placed her children in, we continue to have doubts that Mother will treat Estrella's sexual abuse with the seriousness that it deserves. This factor therefore favors termination.

Finally, the trial court found that Mother had not paid child support consistent with the guidelines. *See* Tenn. Code Ann. § 36-1-113(i)(9). While it is true that Mother paid support following the filing of the termination petition, she did not pay support consistently or ever at the amount that was requested by DCS. As such, this factor indeed favors termination.

In addition to the enumerated factors, the trial court also made the following findings in support of its best interest determination:

> The children are in a preadoptive foster home that is very loving. The children are bonded with them and consider them their parents. At the time when the mother is out getting arrested for drug paraphernalia in Stewart County and the father serving his long jail sentence, the foster parents have been [] taking care of these children. The foster home is providing the care that has ensured, based on the testimony the Court has heard, that they are developmentally on track, they are academically on track, and that they are receiving counseling for some[thing] that the mother has consistently denied that even happened, the sexual abuse perpetrated upon them by Jerry A[.]
>
> *   *   *
>
> The foster parents are well situated, they have provided care, financial and emotion support to the child, and love her as if they [] were their own biological children. If we were to change custody arrangement and place the children with their biological parents, the Court finds that would pose a substantial risk of harm to both the physical and emotional well being of the minor children.

*See* Tenn. Code Ann. § 36-1-113(i) (stating that court "is not limited to" considering the enumerated factors).

Based on the totality of the circumstances, we agree with the trial court that termination is in the best interests of the children at issue in this case. Here, Mother knowingly allowed one of her children to be abused under her care. When she was told about this abuse, she did nothing but tell her daughter how to respond if the abuse happened again. This suggests not only that Mother was not truthful when she stated she first believed that the irritation that Estrella was experiencing was due to hygiene issues, but also that she foresaw the horrifying possibility that such an incident could occur again in the future. And then when the children were removed from her care, she still denied her culpability for the abuse and delayed taking the classes that were directly related to remedying the conditions that led to the abuse. Moreover, this was not the first time that Mother's children had been victimized by a man she allowed around her children, nor was it the last time that she brought an inappropriate man into her children's orbit. While all parental conduct may not be irredeemable, *White*, 171 S.W.3d at 193, some conduct certainly comes close. And even though Mother did participate in visitation, the visitation never progressed beyond the limited scope that was permitted at the outset of the case.

Finally, as the trial court stressed, the children are doing well in a home that provides them with the care and stability that they need. They view their foster parents as their parents and would be harmed if returned to Mother's custody. We know that Mother has other children in her home, whom she is apparently parenting with some success.[28] We hope that Mother's efforts continue with regard to these children and that she protects them as she failed to do her older children. But we determine a child's best interest from the child's rather than the parent's perspective. *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005). From the children's perspective, they have a loving, safe home that has a good possibility of being forever. Their best interests are therefore served by remaining with this family. The trial court's finding that termination of Mother's parental rights is in the children's best interest is affirmed.

## V. CONCLUSION

The judgment of the Montgomery County Juvenile Court is affirmed, and this cause is remanded for further proceedings consistent with this Opinion. Costs of this appeal are taxed to Appellant, Dixie A., for all of which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE

---

[28] Ms. Huggins testified that "[t]here have been multiple referrals called in for the other two children[.]" DCS had not taken action to remove the younger children, however, as Ms. Chapman agreed that the children are "safe enough and well cared for enough that [DCS doesn't] see a need to remove them[.]"